UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MICHAEL V. ORSI                     )
                                    )
V.                                  )           NO. 2:14-CV-142
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders

of the Court and 28 U.S.C. § 636 for a report and recommendation. Mr. Orsi's

application for disability insurance benefits was denied following a hearing before an

Administrative Law Judge ["ALJ"] in Newark, New Jersey. This action is one for

judicial review of that adverse decision.

The sole function of this Court in making this review is to determine whether the

findings of the Commissioner are supported by substantial evidence in the record.

*McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir.

1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept

as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389

(1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict

when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal*

*Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual

issues differently, the Commissioner's decision must stand if supported by substantial

evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The Plaintiff was 29 years of age on his alleged onset date of March 3, 2008, a younger individual under the Social Security regulations, and he is still a younger individual. He has a limited education, having completed 11th grade and attended carpentry school. He had been employed for several years as a carpenter when a very heavy window frame fell on him at work.

The Plaintiff's medical history related to his claim is described in the brief of the Defendant Commissioner as follows:

> On March 3, 2008, Plaintiff was taken to the emergency room after a large window pane fell on him while working as a carpenter (Tr. 77, 81-82, 287). Upon examination, Plaintiff had tenderness in his cervical spine and lower quadrant (Tr. 305, 359). X-rays and CT scans of Plaintiff's head, chest, cervical spine, and pelvis were normal except for showing a metal rod in his right femur from a previous surgery (Tr. 303, 306, 312-14, 320-24, 345-52). Plaintiff was treated for a crush injury to his neck and hips, and received pain medication and crutches (Tr. 302). He was discharged the following day with instruction to follow up with the clinic as needed (Tr. 294, 302-03).
>
> Beginning on April 29, 2008, Plaintiff received care from the physicians of University Orthopedics of New York (Tr. 486). He primarily saw Steven Touliopoulos, M.D., for treatment of his symptoms, and also saw Charles A. DeMarco, M.D., for treatment of his low back pain and Andrew Merola, M.D., for treatment of his neck pain (Tr. 126-31, 486-574, 579-657, 717- 28, 732-75).
>
> At his initial visit in April 2008, Plaintiff complained of back, hip, and neck pain following the work accident (Tr. 486-87). He reported difficulty standing and walking for even short periods, and he sometimes used a cane or crutches to ambulate (Tr. 486). He took ibuprofen for his pain (Tr. 486). Plaintiff reported that he fractured his right femur in 2004, but he returned to work and normal activities afterward (Tr. 486). Upon examination, Plaintiff ambulated

2

without a cane but with an antalgic gait (Tr. 486). Plaintiff had a reduced range of motion in his hips and tenderness, spasm, and restricted motion in his cervical spine (Tr. 486). Dr. Touliopoulos assessed cervical strain and bilateral hip contusion (Tr. 486). He recommended physical therapy, prescribed pain medication, and stated that Plaintiff remained "truly disabled from his employment" (Tr. 487).

The following month, x-rays of Plaintiff's cervical spine and hips showed no obvious fractures or dislocations (Tr. 489, 523-24). Plaintiff reported that pain medication helped to a certain degree (Tr. 489). Dr. Touliopoulos restricted Plaintiff to weight bearing as tolerated on his right lower extremity with use of his cane as needed (Tr. 489). Dr. Touliopoulos stated that Plaintiff remained totally disabled from his employment (Tr. 489).

In July 2008, Plaintiff was sent to the emergency room with complaints of breathlessness, numbness in his extremities, and cramping (Tr. 430, 434). A physical examination was essentially normal and Plaintiff received treatment for an anxiety attack (Tr. 431-32, 434-35). At a follow up appointment with Dr. Touliopoulos, Plaintiff reported two more anxiety attacks (Tr. 490). Plaintiff rated his neck and right hip pain a 9 to 10 out of 10 (Tr. 490). Plaintiff stated that he was unable to drive and had significant difficulty taking public transportation (Tr. 490). He reported that his fiancée assisted in daily activities such as cooking and shopping (Tr. 490). A physical examination remained unchanged (Tr. 490-91). Dr. Touliopoulos referred Plaintiff to a psychiatrist (Tr. 490-91).

In October 2008, an MRI scan of Plaintiff's right hip showed no obvious evidence of labral tear (Tr. 493, 526). Dr. Touliopoulos recommended right hip arthroscopic surgery (Tr. 493). Plaintiff returned for follow up appointments in November 2008, January 2009, March 2009, and May 2009 (Tr. 496-501). He reported difficulty walking more than two blocks and negotiating even a few steps (Tr. 494, 496, 498). Upon examination, Plaintiff exhibited difficulty getting on and off the examination table and rising from a sitting position (Tr. 494, 496, 498, 500).

On May 29, 2009, Plaintiff underwent right hip arthroscopy with Dr. Touliopoulos (Tr. 480, 502-04). On his surgery intake form, Plaintiff rated his pain a 6 on scale of 0 to 10 (Tr. 463). He reported that his pain was satisfactorily controlled with hydrocodone and he did not use a cane or crutches (Tr. 463-64). Following surgery, Plaintiff used crutches and a hip abduction brace (Tr. 506, 508). He was instructed to advance to a cane as tolerated (Tr. 506, 508). Plaintiff was noted to be totally disabled from all work at that time (Tr. 506, 508).

In July 2009, Plaintiff visited Dr. Merola at University Orthopedics of New York for evaluation of his neck pain (Tr. 509). He reported increasing pain shooting into his upper extremities (Tr. 509). He stated that he could not bend, lift, twist, push, pull, stoop, crawl, sit or stand for prolonged periods of time, and had headaches and difficulty sleeping at night (Tr. 509). Upon examination, Plaintiff had severely restricted cervical range of motion with palpable pain, spasm, and tenderness in his neck (Tr. 509). He had decreased reflexes and

3

sensation in his upper extremities (Tr. 509). A subsequent MRI scan showed no herniations at C5-6 and C6-7, but Dr. Merola reviewed the films and indicated that herniations were appreciated (Tr. 512, 528). Dr. Merola recommended epidural steroid injections and stated that Plaintiff was "totally disabled" (Tr. 512).

The following month, Plaintiff reported improvement in his right hip symptoms, although he continued to have soreness, weakness, discomfort, and intermittent pain (Tr. 510). He underwent a series of physical therapy sessions and indicated that it helped to a certain degree (Tr. 513). By November 2009, Plaintiff had moderate improvement in overall function and pain, with some ongoing hip discomfort and intermittent pain (Tr. 515). Plaintiff reported difficulty negotiating steps and increased discomfort after walking more than four blocks (Tr. 515). Dr. Touliopoulos indicated that Plaintiff was disabled from his employment with respect to his hip injuries (Tr. 514, 516).

Plaintiff returned to see Dr. Merola on November 16, 2009, with complaints of progressively severe neck pain and pain radiating into his arms (Tr. 517). Plaintiff's symptoms were aggravated by recent assault and mugging (Tr. 517). Upon examination, Plaintiff had spasm and tenderness in the neck with limited rotation (Tr. 517). Dr. Merola indicated that Plaintiff remained otherwise totally disabled (Tr. 517).

Plaintiff continued to see the physicians at University Orthopedics of New York for conservative treatment of his symptoms (Tr. 518-21, 615-26). In December 2009, Dr. DeMarco noted that Plaintiff had improved overall following surgery (Tr. 518). In February 2010, Plaintiff reported increasing and significant recurrent hip pain (Tr. 521). An MRI scan revealed no obvious labral tear or intra-articular loose body (Tr. 521, 531). X-rays in June 2010 showed some bony changes and a degree of joint space narrowing in Plaintiff's hips (Tr. 621). Dr. Touliopoulos recommended a second right hip arthroscopic surgery and indicated that Plaintiff would likely need a total hip arthroplasty in the future (Tr. 617, 620, 623). Dr. Touliopoulos indicated that Plaintiff was totally disabled from his employment and had an overall partial marked disability (Tr. 622, 626, 728).

On September 28, 2010, Plaintiff attended a mental status evaluation with Gerard A. Figurelli, Ph.D. (Tr. 661-64). Plaintiff reported problems with depression after his injury (Tr. 661). During the evaluation, Plaintiff established eye contact and remained alert, compliant, and responsive (Tr. 661). He communicated using full sentences and had no difficulty with comprehension or focus (Tr. 661). He had no significant deficits with immediate recall or concentration on a structured task, and appeared to be around average intelligence (Tr. 662). Plaintiff reported no history of psychiatric treatment or psychotropic medication, but indicated that he had a history of using alcohol to self-medicate and a history of a learning disorder (Tr. 662-63). He stated that he took public transportation to doctor appointments and performed some routine household chores including cleaning, laundry, washing the dishes, and cooking using a

4

microwave (Tr. 663). Dr. Figurelli assessed Plaintiff with dysthymic disorder, alcohol abuse, and learning disorder (Tr. 664).

On October 4, 2010, Plaintiff attended a physical examination with Justin Fernando, M.D. (Tr. 666-68). Upon examination, Plaintiff had a normal gait and station and did not use an assistive device (Tr. 667). He walked on his heels and toes without difficulty, needed no help getting on or off the examination table, and performed a full squat (Tr. 667-68). Plaintiff had a full range of motion in his cervical spine with no spasm or tenderness (Tr. 667). He had a mild degree of limitation in his right hip (Tr. 667). Otherwise, Plaintiff displayed normal strength, no muscle atrophy, no sensory abnormality, and normal reflexes (Tr. 667). Dr. Fernando indicated that Plaintiff had a nearly normal examination except for a very mild reduction in right hip forward flexion and a significant reduction of right hip internal rotation (Tr. 668).

On October 28, 2010, Plaintiff underwent a revision of his right hip arthroscopy (Tr. 691- 92). In the months after the surgery, Plaintiff reported that his pain and dysfunction improved, but he experienced residual soreness, weakness, stiffness, discomfort, and intermittent pain (Tr. 629, 630, 631, 632).

Plaintiff attended physical therapy in March 2011, with modest to moderate improvement in his right hip pain and functioning (Tr. 694-700, 721). Dr. Touliopoulos recommended continued conservative treatment including activity modifications and an appropriate exercise program, physical therapy, and anti-inflammatory and analgesic medications (Tr. 720, 722, 724). He noted that Plaintiff would eventually require a total hip arthroplasty, and he remained totally disabled from his employment (Tr. 720, 722, 724).

On June 8, 2011, Plaintiff underwent another physical evaluation with Dr. Fernando (Tr. 702-04). Upon examination, Plaintiff showed no clinical indication of any range of motion abnormality, muscle atrophy, or sensation abnormality (Tr. 703-04). Plaintiff walked on his heels and toes without difficulty and could squat to 75 to 80 percent full (Tr. 703). Dr. Fernando indicated that Plaintiff had a normal physical examination, with a normal gait and station, and a full range of motion in the spine and hips (Tr. 703-04).

Plaintiff returned to University Orthopedics of New York on July 31, 2011 with reports of a recent fall (Tr. 717-18). Upon examination Plaintiff had a mild to moderate antalgic gait, and moderate restriction of right and left hip range of motion (Tr. 717). The following month, Plaintiff's gait improved, but remained antalgic (Tr. 741). He had a moderate restriction of right hip motion and a mild restriction of left hip motion (Tr. 741). Plaintiff returned for medication refills in October, November, and December 2011 (Tr. 732, 738, 740). Dr. Touliopoulos recommended continued conservative measures and indicated that Plaintiff could bear weight as tolerated (Tr. 732, 738, 740). Dr. Touliopoulos stated that Plaintiff was permanently disabled from his employment as a carpenter (Tr. 732, 738).

Dr. Touliopoulos completed a medical source statement on November 22, 2011, indicating that Plaintiff had bilateral hip labral capsular injuries and bilateral progressive posttraumatic degenerative joint disease (Tr. 733). He opined

that Plaintiff could walk 1 to 2 blocks without rest; sit for 30 minutes at a time and less than 2 hours total in an 8-hour workday; and stand for 30 minutes at time and less than 2 hours total in an 8-hour workday (Tr. 734-35). Dr. Touliopoulos indicated that Plaintiff must walk every 15 minutes for 10 minutes at a time (Tr. 735). Plaintiff could occasionally lift less than 10 pounds, but never more than 10 pounds (Tr. 725-36). He could occasionally bend and kneel, but could never stoop, crawl, climb, or squat (Tr. 736). Dr. Touliopoulos noted that Plaintiff would be absent from work about once a month due to his impairments or treatments (Tr. 736).

In January 2012, Plaintiff reported that he slipped and fell on a set of stairs, injuring his right shoulder, cervical spine, and right knee (Tr. 745). He received conservative treatment over the next several months (Tr. 744-48). On September 11, 2012, Dr. Touliopoulos provided a narrative statement of Plaintiff's treatment history (Tr. 775). Dr. Touliopoulos opined that Plaintiff's injuries were related to the work accident that occurred on March 3, 2008, and Plaintiff remained totally disabled from his employment as a carpenter (Tr. 775).

Martin Fechner, M.D., a physician specializing in internal medicine, testified at the supplemental hearing (Tr. 34-52, 163). He stated that Plaintiff's impairments did not meet or medically equal the criteria of a listed impairment (Tr. 46). Dr. Fechner testified that Plaintiff was restricted, but could do a full range of sedentary work (Tr. 46). He stated that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, but would be limited to sedentary work due to walking and standing for an aggregate of 2 hours in an 8-hour day (Tr. 46-47). Plaintiff could sit for 6 hours in an 8-hour day but he needed to stand up and stretch every 45 minutes to an hour (Tr. 48). Dr. Fechner indicated that Plaintiff could occasionally bend, stoop, and crouch but could not crawl or climb ladders of scaffolds (Tr. 48).

[Doc. 31, pgs. 2-9].

Patricia Sasona testified at the supplemental hearing as a vocational expert. She was asked a hypothetical question regarding whether jobs existed which an individual could perform who had Plaintiff's vocational characteristics and the capabilities which the ALJ found that the Plaintiff possessed, which was a reduced range of sedentary work and other limitations discussed further in this report and recommendation. She opined that while he could not perform his past relevant work as a carpenter, jobs existed which

the Plaintiff could perform in the national economy, such as a table worker, final assembler, patcher and ampoule sealer. (Tr. 63-65).

On December 13, 2012, the ALJ in New Jersey entered his hearing decision. She found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, and that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 3, 2008. Regarding the existence of severe impairments, she found that the Plaintiff had a sequelae crush hip injury with a right hip fracture and titanium rod placement. She did not find that the Plaintiff had a severe mental impairment, although she stated that "it is reasonable that the claimant's impairments could cause some symptoms including symptoms of fatigue and lack of energy and these symptoms have been generously considered within the delineated residual functional capacity and there is no evidence to support further restrictions." (Tr. 16-17).

After finding that the Plaintiff did not meet or medically equal any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1, she proceeded to opine as to the Plaintiff's residual functional capacity ["RFC"]. She found that he had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) except claimant is able to sit for hours *[sic]*[1] in an 8 hour day with the ability to stretch every 45 minutes to an hour; clamant can stand or walk for 2 hours with normal breaks; claimant can lift or carry up to

---

[1] In the hypothetical question to VE, the ALJ stated the individual could sit for six hours in an eight hour day with breaks every 45 minutes.

7

20 pounds occasionally and 10 pounds frequently; claimant can do occasional bending and crouching; claimant is unable to crouch, crawl, climb ladders or scaffolds; claimant is able to use his hands for fine fingering and grasping frequently; claimant is limited to work that can be learned in one month or less and that involves simple instructions; claimant will be off task for five to 6 minutes per hour." (Tr. 17).

The ALJ then discussed the Plaintiff's statements and activities. She noted that the Plaintiff lived in a fifth floor apartment with no elevator. She stated that the Plaintiff testified that his treating doctor had performed surgery twice on his right hip and would like to operate on his left hip but could not because the right hip was too weak. She said Plaintiff stated that he could not stand or sit for more than 20 minutes at a time because of neck pain. In January 2012, Plaintiff exacerbated his injuries when his hip gave out going down the stairs. She indicated Plaintiff stated that this happens "if he is out all day and walking." (Tr. 18). The ALJ stated that Plaintiff said that on a typical day, he would get up and dress and spend the day watching television or talking with his family on the phone. She then stated that the Plaintiff "reported that he travels to his doctor by taking public transportation. He described that he is able walk approximately three blocks to the light rail, use the path and subway systems, and walk another three blocks to his doctor's office. He stated that he did not believe he would be able to do this regularly." (Tr. 18).

The ALJ then stated that while the Plaintiff's impairments could cause his symptoms, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent." with the ALJ's RFC

8

finding. While Plaintiff's hip injury would cause pain on exertion to support the RFC finding, "the medical evidence of record does not support total disability." (Tr. 18).

The ALJ then discussed why she found that the Plaintiff was not totally credible. She said Plaintiff's description of the symptoms and limitations caused by his impairments "has generally been partially persuasive," she found that his description was "at times inconsistent with the objective medical evidence." (Tr. 18). In that regard, she found his testimony about his earlier automobile accident consistent with the treatment records for that accident. She also found that his crushing injury in 2008 exacerbated the injury suffered in the automobile accident, and noted that Plaintiff complained after that of severe right hip pain and numbness radiating from his right hip into his lower right leg. However, the ALJ found certain information in the record "inconsistent with the severity as reported by the claimant." (Tr. 18). She stated that "although the claimant reported severe pain in April 2008, he is reported as only taking ibuprofen medication and not receiving physical therapy. He was further reported as walking with a limp due to pain and used a cane or crutches only on an as needed basis. His physical examination performed at that time also revealed he ambulated with an antalgic gate but did not need a cane." (Tr. 18-19).

The ALJ stated that examination of Plaintiff's hip revealed tenderness on the trochanteric bursa and crepitus. He had a decreased range of motion in the hip and atrophy in the right thigh muscles. He had tenderness in the mid to lower cervical regions and moderate muscle spasm, with soft tissue swelling and restriction of motion.

9

This, said the ALJ, supported the sedentary limitation set out in her RFC finding.  (Tr. 19).

The ALJ noted the Plaintiff's complaints of difficulty bending, walking, lifting and carrying and an inability to sit for extended periods were consistent with the diagnostic evidence "but not to the extent of total disability." (Tr. 19).   May 2008 radiographs of the cervical spine revealed straightening of the lordosis but no obvious fractures or dislocations.  A September 2008 MR arthrogram of the right hip showed no evidence of a labral tear.  An MRI of the hip in 2010 also revealed no labral tear and no fracture or necrosis.  The sacroiliac joints were normal.  The ALJ said that MRI was reported similar to a previous 2008 exam.  (Tr. 19).

The ALJ said that the Plaintiff had received treatment "that has been generally successful in controlling his symptoms to a sedentary exertional level." (Tr. 19).   The ALJ noted that the Plaintiff's January 2011 treatment notes mentioned trouble sitting in a constant position, difficulty sleeping and difficulty bearing weight.  This led to a May 2009 arthroscopy of the hip.  After this surgery, the ALJ stated that Plaintiff's physical exam demonstrated a well healed incision with minimal soft tissue swelling or gross signs of instability.  By August 2009 Plaintiff could walk without a can or brace.  His right thigh exhibited moderate atrophy.  (Tr. 19).

Plaintiff had arthroscopic surgery again on the right hip in October 2010.  The ALJ said that this did not reveal any evidence of hip instability or significant restriction

10

of hip motion.  Following the surgery, Plaintiff exhibited a well healed incision and good dorsiflexion and plantar flexion of the foot.  (Tr. 19).

In March 2011, Plaintiff underwent rehabilitation therapy.  He could carry approximately 5 pounds, climb and dress without minimal difficulty, bend forward and squat with moderate difficulty, sit for up to 15 minutes before needing to adjust and walk for up to 10 minutes before experiencing pain.  The ALJ noted that the stated goal of the rehabilitation was to improve his lifting ability to 15 pounds without pain, to stand or walk 30 minutes without pain, and to sit for 30 minutes without adjusting his position. Even though there were no further rehabilitation notes for that time period, the ALJ concluded that "current treatment demonstrates some improvement of the Plaintiff's injury." (Tr. 20).  She cited as an example that he in July 2011, Plaintiff reported moderate improvement with his hip pain and motion.  He continued to walk without a cane.  Plaintiff did continue to report difficulty when performing various postural activities, including sitting, but walked without a cane or brace.  A physical exam showed an improved, but still antalgic, gait.  (Tr. 20).

The ALJ then discussed the state agency consultative exam of June 2011.  The consultative examiner reported the Plaintiff walked with a normal gait, and could heel and toe walk without difficulty, and could squat to 75%.  He had a full range of motion in his cervical spine.  The MRI examinations were reported as normal.  (Tr. 20).

The ALJ then stated again that Plaintiff's subjective complaints to the extent it would preclude sedentary work were not fully credible.  The ALJ said this because the

subjective complaints were inconsistent with the findings described in the objective medical evidence. He stated that Plaintiff's daily activities were not limited to the extent that would be expected with the complaints of symptoms and limitations set forth by the Plaintiff. She noted he took three forms of public transport and walked several blocks to go to the doctor, and that this was consistent with the ALJ's RFC finding. He noted the Plaintiff said he had difficulty climbing stairs but lived where he had to climb 5 flights of stairs daily. (Tr. 20). He noted that although in May 2012 Plaintiff complained of pain and weakness in his shoulders and difficulty sitting, he was not receiving therapy and walked without an assistive device. (Tr. 21).

The ALJ then discussed Dr. Fechner, the medical expert who did not examine the Plaintiff but testified at the hearing. He found his opinions "well supported and not inconsistent with the other substantial evidence." (Tr. 21). He also gave great weight for the same reasons to the opinions of the state agency medical consultants. (Tr. 21).

With respect to Dr. Touliopoulous, the treating orthopedic surgeon, he gave his opinion little weight. He said "the doctor apparently relied quite heavily on the subjective report of symptoms and limitations reported by the claimant," and accepted Plaintiff's reports uncritically. (Tr. 21). He said this was shown that although the surgery notes revealed that the surgeries were well tolerated, he still opined Plaintiff was disabled. Also, the ALJ noted that this was inconsistent with the findings of the consultative examiner which showed relatively normal diagnostic testing of the spine. Also, the ALJ said the treating physician's use of the term "disabled" indicated it was not

12

clear that the doctor understood the definition of the word for Social Security purposes. She said the ALJ was apparently using that term with respect to Plaintiff's inability to do his past work as a carpenter, which was consistent with the findings of the ALJ. (Tr. 21).

She did not give full weight to the opinions of the state agency doctors who opined Plaintiff could do light work "based on the significant hip surgeries and current treatment notes." (Tr. 21).

The ALJ then found that the Plaintiff could not return to his past relevant work as a carpenter. She stated that the Plaintiff was a younger individual with a limited education. If the Plaintiff could do a full range of sedentary work, he would be not disabled under Medical-Vocational Rule 201.24. However, based upon the RFC finding, and the question asked of the VE, she found that there were a significant number of jobs which the Plaintiff could perform. Accordingly, she found that he was not disabled. (Tr. 22-23).

Plaintiff asserts four bases of error by the ALJ in adjudicating the Plaintiff's case. First, he states that the ALJ failed to comply with Sixth Circuit case law in essentially rejecting the opinion of the Plaintiff's treating orthopedist, Dr. Touliopoulos. In this regard, Plaintiff asserts that Doctor Touliopoulos should have been accorded controlling weight, and if not given controlling weight, should have still been weighed using the factors in 20 CFR § 404.1427. Second, he states that she erred in failing to "even mention, much less discredit, the opinion of Dr. Merola," who treated Plaintiff's difficulties with his cervical spine. Third, he asserts that the ALJ erred in evaluating

13

Plaintiff's subjective complaints and credibility. Finally, Plaintiff asserts that the identification of jobs by the VE was tainted because the question asked of her did not include all of the Plaintiff's limitations.

With regard to Dr. Toulipoulos, the medical opinions of treating doctors are entitled to "substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). This is required by 20 CFR §404.1527(d)(2), which says that more weight is to be accorded to treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." Thus, the regulations indicate that a treating doctor's opinion *may* well be entitled to more weight than the opinion of one time consultative examiner, or someone who merely looks at medical records. Moreover, the regulation states that if the treating doctor's opinion "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.* If it is inconsistent with other substantial evidence, then the regulation says the Commissioner will apply other factors in considering how much weight to give the treating source's opinion, such as length of the treatment relationship, the nature and extent of the treatment relationship, supportability of the opinion,

14

consistency with the record as a whole, the specialization of the treating source *vis a vis* other practitioners offering opinions, and other factors such as familiarity with other information in the case record.

Dr. Touliopoulos treated the Plaintiff for several years following his accident in 2008. He performed two serious surgical procedures on the Plaintiff's hip. The in-depth progress notes of his examinations and treatment of the Plaintiff cover hundreds of pages of the record (Tr. 126-131, 486-574, 57-657, 717-728, 732-749). He also wrote a 25 page typewritten narrative report of his treatment of the Plaintiff and his various findings. In short, this is one of the most detailed and documented reports by a physician imaginable. But, as the regulations and cases say, the opinion of the treating doctor must be well-supported, internally consistent with the doctor's own records, and not inconsistent with other substantial evidence in the record.

Dr. Touliopoulos's opinion on Plaintiff's capabilities is set forth on pages 122-125 of the record. He stated that the Plaintiff suffers from "pain, swelling and weakness, difficulty standing or walking for a prolonged period of time without pain." (Tr. 122). He noted he has observed that the Plaintiff has an abnormal gait, tenderness, crepitus, muscle spasms, atrophy and weakness, and that his prognosis is guarded (Tr. 122-123). As for specific restrictions, he opined that Plaintiff can walk for one to two blocks without rest, and sit for no more than 30 minutes or stand for no more than 30 minutes. He stated that the Plaintiff could not sit or stand/walk for more than two hours total in an eight hour workday with normal breaks, and would need periods of walking to relieve

15

pain for as much as 10 minutes as often as every 15 minutes. (Tr. 124). Any kind of job he did would have to allow shifting positions at will from sitting, standing or walking and allow unscheduled breaks. The doctor opined Plaintiff could lift less than 10 pounds occasionally (Tr. 124) and could lift no weight of 10 pounds or more on a frequent basis (Tr. 125).

These are, admittedly, very severe restrictions, particularly for a young man such as the Plaintiff. However, skepticism by laypersons such as this Court and the ALJ is something to be resolved by medical opinion evidence. The first issue is, are the restrictions opined by Dr. Touliopoulos in conflict with his medical records while he was treating the Plaintiff? In a large number of cases, a treating source's progress notes will be replete with essentially normal findings, very little diagnostic testing, unexplained conservative treatment, or obvious unquestioning dependence on the subjective complaints of the patient.

After examining the treatment records of Plaintiff generated by Dr. Touliopoulos, the Court is of the opinion that they are not inconsistent with his opinions of Plaintiff's working capabilities. Even if one does not parse through the records a page at a time, reading the 25 page summarization (Tr. 750-775) of those records will indicate that the doctor was consistent in his observations and tests, and the findings based upon those observations and tests. As stated earlier, while the restrictions opined by the doctor are severe, and certainly more severe than those opined by the ALJ based upon the opinions of the non-examining medical expert at the trial, § 1527(d)(2) points out that the whole

16

reason for controlling, or at least great weight being given to a treating doctor's opinion is because he or she may bring a unique perspective that cannot be obtained from the medical findings alone or from reports such as that of the consultative examiner or the non-examining medical expert at the trial.

A recent Sixth Circuit case supports this analysis. In *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365 (6th Cir. 2013) the ALJ, as here, gave little weight to the treating doctor, and relied upon the opinions of consultative examiners and non-examining doctors in reaching the decision that the Plaintiff was not disabled. Noting the requirement of § 1527 to give "good reasons" for the weight given to the treating physician's opinion, the Court stated "[s]urely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise, the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources." *Id.,* at 377. The Court went on to determine if Plaintiff's treating doctor's opinion was inconsistent with his records, and found that it was not.

Examining the reasons that the present ALJ gave for rejecting the opinion of Dr. Touliopoulos, she first says the doctor "apparently" relied heavily upon subjective complaints from Mr. Orsi. Visible right thigh atrophy and muscle spasm are not

17

subjective complaints. And while it could be said that a Plaintiff could certainly fake a painful response in testing such as straight leg raising, a doctor is entitled to rely upon expertise and other physical observations in determining whether a patient is feigning pain. Such notations in his records are consistent throughout the record of his treatment of the Plaintiff.

The ALJ also stated she relied upon the diagnostic testing of Plaintiff's spine during the 2010 consultative exam which was "relatively normal." Dr. Merola, a partner of Dr. Touliopoulos who treated Plaintiff for his cervical spine problems, looked at the MRI from July 13, 2009, and disagreed with the radiologist, stating that he observed herniations at both C5-C6 and C6-C7. (Tr. 512). Dr. Merola ordered this testing done after examining Plaintiff on July 6th, noting "palpable pain, spasm, and tenderness present in the neck," and a severely restricted cervical range of motion. (Tr. 509).

The ALJ also discounts Dr. Touliopolous's opinion because it appeared to her that the doctor was perhaps "not familiar with the definition of disability" in the Social Security context. It is true that at times the doctor referred to Plaintiff being disabled from his occupation as a carpenter. (Tr. 775) However, whether or not he was unfamiliar with that term is irrelevant here because he opined that the Plaintiff had specific limitations in lifting, standing/walking and sitting which were more severe than those found by the medical expert and relied upon by the ALJ.

*Gayheart, supra*, goes on to say that "[t]o be sure, a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative

18

doctors than to those of treating physicians…but the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed they call for just the opposite." *Id*. at 379-80.

Even if Dr. Touliopoulos was not entitled to controlling weight, the factors in § 404.1427 would indicate his opinion was entitled to great weight when contrasted against the opinion of the consultative examiner and the non-examining medical expert. The factors of length of treatment relationship, detail in the progress notes, the supportability of his opinion by testing and exam findings, and his specialty in orthopedics are all strongly in favor of giving him greater weight than any of the physicians relied upon by the ALJ.

If there are other valid bases for the ALJ rejecting the opinion of Dr. Touliopolous, such as inconsistencies in the progress notes, or between the progress notes and his opinion on Plaintiff's capabilities, it is the responsibility of the Commissioner to articulate them in order to let claimants understand the disposition of their cases and to ensure that the "ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Blakely v. Commissioner of Social Sec.*, 581 F.3d 399, 406-407 (6th Cir. 2009). No other reasons are given.

The Court is also of the opinion that the failure of the ALJ to discuss, or even mention, the opinion of Dr. Merola was error. It is true that he was an associate in the practice of Dr. Touliopoulos, but his treatment and orthopedic opinion regarding Plaintiff's cervical condition should certainly have been addressed and weight assigned.

19

It is true he repeatedly stated the Plaintiff was "disabled," which is a finding reserved to the Commissioner. But with the serious findings he mentioned, such as muscle spasm and herniated discs in the neck, some discussion was certainly warranted.

In light of the weight which should have been given to Dr. Touliopoulos's opinion, Plaintiff's credibility determination is suspect. Walking some to take the subway, train or bus to get to occasional doctor visits, and climbing 5 flights of stairs at an unknown pace would not appear to the Court to be dramatic evidence upon which the trier of fact could hang her hat. The Court certainly acknowledges the deference to be afforded to the ALJ as trier of fact, but with greater deference owed to Plaintiff's treating physicians, the medical findings that were made by them support the Plaintiff's subjective complaints. Also, some of the reasons given, such as Plaintiff taking only ibuprofen for pain and not having physical therapy were just plain misleading. The ALJ surely knew that the Plaintiff took ibuprofen only until Dr. Touliopoulos prescribed Percodan and later oxycodone. Also, she should have known that physical therapy was finally approved for Plaintiff and he had at least 18 sessions.

Since good reasons were not given for rejecting the restrictions imposed by Dr. Touliopoulos, at this juncture the Court finds that there was not substantial evidence to support the RFC finding or the question to the VE.

The VE testified that if the Plaintiff had the limitations opined by Dr. Touliopoulos on the total time the Plaintiff could sit, there would be no jobs (Tr. 70).

This case presents an extraordinary set of circumstances. However, given the

dictates of *Gayheart*, and other cases, and the regulatory framework on which they are based, Dr. Touliopoulos's opinion and the records supporting that opinion establish that the Plaintiff is disabled. The Court does not see how a remand could change this. Of course, the Plaintiff may experience medical improvement, and it is hoped that he will for his sake. However, at this time, he has proved that he is entitled to disability insurance benefits. Accordingly, it is respectfully recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 24] be GRANTED, that the Defendant Commissioner's Motion for Summary Judgment [Doc. 30] be DENIED, and that the case be remanded for an award of benefits.[2]

Respectfully submitted,

_____s/Clifton L. Corker_____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

21